UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| GEORGE D. HOUSER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 16-0804 (RBW) |
| ) | |
| U.S. DEPARTMENT OF HEALTH AND ) | |
| HUMAN SERVICES, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION**

This matter is before the Court on Defendant's Motion for Summary Judgment (ECF No. 56). For the reasons discussed below, the Court grants the motion.[1]

**I. BACKGROUND**

  **A. Procedural History**

George D. Houser ("the plaintiff") brought this civil action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 (2018), against the United States Department of Health & Human Services ("HHS"), Centers for Medicare and Medicaid Services ("CMS"). *See* Complaint (ECF No. 1, "Compl.") ¶¶ 2, 9-16. After the Court denied without prejudice the defendant's first motion for summary judgment on September 15, 2017, CMS undertook efforts to compile and process for the plaintiff information maintained by a CMS contractor. *See* Defendants' Status Report and Proposed Schedule for Further Proceedings (ECF No. 43) at 1-2.

---

[1] The plaintiff's motions for extensions of time and for other relief (ECF Nos. 64-65, 67-68 and 71) will also be denied.

1

In addition, CMS sought to determine whether certain potentially responsive records had been destroyed, *see* Defendants' Status Report and Proposed Schedule for Further Proceedings (ECF No. 49) at 1-2, and to obtain potentially responsive records from the Georgia Department of Community Health, *see id*.; Defendants' Status Report and Proposed Schedule for Further Proceedings (ECF No. 51) at 1-2.

The defendant filed its renewed summary judgment motion (ECF No. 56) on April 8, 2019. On April 9, 2019, the Court issued an Order (ECF No. 57) advising the plaintiff of his obligations under the Federal Rules of Civil Procedure and the Local Civil Rules of this Court to respond to the motion. Specifically, the Order advised the plaintiff that if he did not file an opposition by June 7, 2019, the Court may enter judgment in the defendant's favor if the "Court satisfies itself that the record and any undisputed material facts justify granting summary judgment." Order, *Houser v. U.S. Dep't of Health & Human Servs.*, No. 16-CV-804 (D.D.C. Apr. 9, 2019) (quoting *Winston & Strawn, LLP v. McLean*, 843 F.3d 503, 507 (D.C. Cir. 2016) (citing Fed. R. Civ. P. 56(e)(3))).

The plaintiff requested three extensions of time to respond to the defendant's motion for summary judgment (ECF Nos. 58, 59, 63), which the Court granted by Minute Orders dated July 1, 2019, September 20, 2019, and January 22, 2020. The Court's January 22, 2020 Minute Order set a new deadline of March 26, 2020, and advised the plaintiff that no further extensions of time would be granted absent a showing by the plaintiff of physical or mental incapacitation verified by a medical professional. Thereafter, the plaintiff filed his fourth and fifth requests for extensions of time (ECF Nos. 64-65). The plaintiff explained that the prison law library had been closed entirely for one week in March 2020, as a measure to prevent spread of the

2

coronavirus.  Third Motion for an Extension of Time to Answer Defendant's Motion for Summary Judgment (ECF No. 64, "Pl.'s Third Mot.") at 1-2.  The plaintiff subsequently represented that for two weeks he was unable to conduct legal research.  *See* Fourth Motion for an Extension of Time to Answer Defendant's Motion for Summary Judgment (ECF No. 65, "Pl.'s Fourth Mot.") at 1-2.  He further explained that prison authorities provided one typewriter and LexisNexis software at one computer work station in each cell block for prisoners' use during a three-hour period each day.  *See id.* at 2.  The plaintiff generally described his access to the typewriter and computer work station as limited, given the number of prisoners who must share these resources.  *See id.*

      The Court is not unsympathetic to the challenges presented to the plaintiff by the additional restrictions imposed at the institution because of the COVID-19 pandemic.  But these restrictions have been in place only since March 2020.  The plaintiff's initial deadline for submitting his opposition to the defendant's motion was June 7, 2019, meaning that he had had roughly nine months to respond to the defendants' motion before the pandemic-related restrictions were imposed.  Furthermore, the plaintiff missed the May 30, 2020 deadline he set for himself for the submission of his opposition.  *See* Pl.'s Fourth Mot. at 1.

      Undaunted, the plaintiff has recently filed three motions for extensions of time for reasons unrelated to the COVID-19 pandemic.  On August 4, 2020, the plaintiff filed a motion to defer consideration of the defendant's pending summary judgment motion pending resolution of additional FOIA requests he made on or about July 25, 2020, to the National Archives and Records Administration for records which originated at HHS.  *See generally* Motion Pursuant to Federal Rule of Civil Procedure § 56(e)(4) to Allow Further Time for Disclosure (ECF No. 67).

On August 10, 2020, the plaintiff filed a motion asking that the Court delay further proceedings in this case until "the mail room at FCI Ashland begins to mail [his] legal mail in accord with the prison's standard regulations." Motion to Pend Further Action Until the Prison Mails Plaintiff's Legal Mail (ECF No. 68) at 1. The plaintiff explained that he intended to mail FOIA-related correspondence by certified mail, but prison officials have not returned to him the certified mail receipts, *see id.* at 2, and the plaintiff presumes that this mail has not been delivered, *see id.* at 3. For this reason, he contended, his access to the court is impaired. *See id.* at 2.

Also on August 10, 2020, the plaintiff filed a Motion Pursuant to Federal Rule of Civil Procedure § 56(e)(4) to Allow Further Time for Disclosure Addendum of Explanation (ECF No. 71). This document alleged that the defendant committed misconduct not only in the course of enforcing regulations against the skilled nursing facilities that corporate entities controlled by the plaintiff once operated, *see id.* at 2-3, but also in the course of responding to the plaintiff's FOIA requests, *see, e.g., id.* at 5.

The plaintiff's August 2020 motions do not justify further delay. The submission of a new FOIA request to a different government agency exceeds the scope of the plaintiff's original complaint. The National Archives' response to the plaintiff's July 25, 2020, FOIA request, whether sent by certified mail or not, has no bearing on HHS's response to the FOIA requests, submitted in 2015, which is at issue in this case. Having already granted the plaintiff three extensions of time to file his opposition, the Court will deny the plaintiff's fourth and fifth requests for extensions of time, as they do not comply with the conditions set forth in the Court's January 22, 2020 Minute Order. The Court will therefore resolve the defendant's motion for

4

summary judgment based on the information currently before the Court and deny the plaintiff's August 2020 motions.

### B. Defendant's Assertions of Fact

#### 1. Forum Healthcare Group and the Plaintiff's Criminal Conviction

Through the Forum Healthcare Group, Inc., the plaintiff once operated three licensed care facilities which received Medicare and Medicaid funds. *See* Defendant's Statement of Material Facts Not In Genuine Dispute (ECF No. 56-2, "Def.'s SMF") ¶¶ 5-6. These facilities were: (1) Forum Group at Mount Berry Nursing and Rehabilitation Center in Rome, Georgia; (2) Forum Group at Moran Lake Nursing and Rehabilitation Center in Rome, Georgia; and (3) Forum Group at Wildwood Park Nursing and Rehabilitation Center in Brunswick, Georgia. *Id*. ¶ 19.

The plaintiff is now serving a prison sentence imposed by the United States District Court for the Northern District of Georgia, arising from his operation of the three health care facilities. The United States Court of Appeals for the Eleventh Circuit provided the following summary of case that resulted in the plaintiff's prison sentence:

> Following a four-week bench trial, George D. Houser was convicted of one count of conspiring with his wife, Rhonda Washington Houser . . . , to commit health care fraud, in violation of 18 U.S.C. § 1349, of eight counts of payroll tax fraud, in violation of 26 U.S.C. § 7202, and of two counts of failure to timely file income tax returns, in violation of 26 U.S.C. § 7203. The district court sentenced Mr. Houser to 240 months' imprisonment and ordered him to pay nearly $7 million in restitution to Medicare and Medicaid and more than $870,000 to the Internal Revenue Service[.]

*United States v. Houser*, 754 F.3d 1335, 1337 (11th Cir. 2014); *see* Def.'s SMF ¶¶ 2-3.

### 2. The Plaintiff's FOIA Requests

On June 23, 2015, CMS received three letters from the plaintiff dated May 8, 2015, May 10, 2015, and June 16, 2015. *See* Def.'s SMF ¶¶ 7-9. CMS treated them as "identical requests for records," Declaration of Hugh Gilmore (ECF No. 12-3, "First Gilmore Decl.") ¶ 5, and assigned the matter a single tracking number, 063020157066, *see* Def.'s SMF ¶ 9.

CMS initially interpreted the plaintiff's letters as a FOIA request for the following information:

> documents, including financial, accounting, reimbursement, programmatic, regulatory, and professional documents, CMS had regarding (1) the Forum Group at Mount Berry Nursing & Rehabilitation, LLC, its Medicare Provider Number 11-5311, and its Medicaid Identification Number . . . 0276[-]229A; (2) the Forum Group at Moran Lake Nursing & Rehabilitation Center, LLC, its Medicare Care Provider Number 11-5311; and its Medication Identification Number 00140[-]368S; (3) the Forum Group at Wildwood Park Nursing & Rehabilitation Center, LLC, its Medicare Care Provider Number 11- 5574; and its Medication Identification Number, which is unavailable; (4) any other facilities regardless of name providing skilled convalescent services at the above locations from May 1, 2003 to December 31, 2007; and (5) Forum Health Group, Inc., Forum Healthcare Group, Inc. and Forum Group Management Services, Inc.

Def.'s SMF ¶ 9.[2] The plaintiff also requested a waiver of all search fees and expedited processing of his FOIA request, *id*. ¶ 9, and reiterated these requests in a subsequent letter dated July 21, 2015, *see id*. ¶¶ 12-13, 16.[3] Although CMS made no determination as to the plaintiff's

---

[2] *See* Compl., Exhibit ("Ex.") 1 (ECF No. 1 at 35-39, May 8, 2015 letter to Diana Mott, with attachment); *id*., Ex. 2 (ECF No. 1 at 43-48, May 10, 2015 letter to Diana Mott, with attachment); *id*., Ex. 3 (ECF No. 1 at 52-88, June 16, 2015 letter to Hugh Gilmore, with attachments).

[3] *See* Compl., Ex. 4 (ECF No. 1 at 89-99, July 21, 2015 letter to Gilbert Silva, III, with attachments).

requests for a fee waiver and expedited processing, it did advance the plaintiff's FOIA request to the head of the queue when the plaintiff filed this lawsuit. *See id*. ¶¶ 12, 16.

By letter dated August 20, 2015, the plaintiff asked CMS to extend the date range until either the date that it conducted its search or to December 31, 2015. *Id*. ¶ 14.[4] Because the named healthcare facilities were no longer operating or CMS had terminated their contracts in 2007, CMS concluded that "extending the date range would not produce any more responsive documents." *Id*.

The plaintiff sent the defendant another letter dated August 20, 2015, which CMS did not receive until December 2015, in addition to yet another letter dated December 4, 2015. *Id*.[5] CMS mistakenly interpreted the December 4, 2015 letter as a complaint by the plaintiff about how CMS was processing his original FOIA request. *Id*. ¶ 15.[6] Accordingly, CMS did not treat the December 4, 2015 letter as "an expansion of [his] original request[]," and did not upload this letter to its FOIA tracking system. *Id*.

### 3. Referral to CMS Region 4

As already noted, the Forum Healthcare nursing facilities were located in Georgia. For this reason, CMS referred the plaintiff's FOIA request to its Region 4 office, the geographic area that includes the state of Georgia. *Id*. ¶ 19.

---

[4] *See* Compl., Ex. 5 (ECF No. 1 at 100-06, August 20, 2015 letter to Gilbert Silva, III, with attachments).
[5] *See* Compl., Ex. 6 (ECF No. 1 at 108, August 20, 2015 letter to Diana Mott).

[6] *See* Compl., Ex. 7 Part 1 (ECF No. 1 at 111-252, December 4, 2015 letter to Gilbert Silva, III and Michael S. Marquis, with attachments).

### a. Cohaba Government Benefit Administrators, LLC

Because the plaintiff sought "financial information such as advances, recoupments and offsets, billed revenue, and notices of revenue and billing status," Region 4 staff in turn referred the matter to its Medicare Administrative Contractor ("MAC"), Cohaba Government Benefit Administrators, LLC ("CGBA"), the entity "responsible for maintaining the types of Medicare financial and claims processing information CMS understood [the plaintiff to be] requesting." *Id*. ¶ 21. Specifically, "CGBA maintained Medicare financial and claims processing records, such as claims, cost reports, and provider enrollment information, in both electronic and hard copy." Supplemental Declaration of Hugh Gilmore (ECF No. 56-3, "Supp. Gilmore Decl.") ¶ 37.

The initial search for responsive records was limited to the use of the facilities' names, Def.'s SMF ¶ 20, because "CMS and the MAC would only have records on the facilities providing medical services, not the corporate entities." *Id*. The records systems that CMS and MAC searched did "not identify corporate structures of the entities and whether other entities may have been operating at the named facilities." *Id*. Nor would CMS and the MAC have maintained Medicaid-related information because the state of Georgia administers the Medicaid program. *See id*. ¶ 11.

Blue Cross/Blue Shield of Georgia preceded CGBA as the MAC for the geographic region where the facilities operated by the plaintiff were located. *Id*. ¶ 36. When CGBA became the MAC in May 2009, Blue Cross/Blue Shield gave CGBA "hard and soft copy records," *id*., and "a manifest of cases for the hard copy records" generated during its time as the MAC, *id*. ¶ 37. CGBA personnel "searched the manifest by Provider Transaction Access Number (PTAN)

for the three skilled convalescent facilities" and located three boxes containing potentially responsive records. *Id*. ¶ 39. A search of these paper records yielded "55 pages of documents specific to the Moran Lake Nursing and Rehabilitation for the time period 2003-2007," First Gilmore Decl. ¶ 8, described as "'Notice of Medicare Program Reimbursement,' settlement notices and reviews of Medicare cost reports[,]" *id*. ¶ 11.

Also searched were CGBA's electronic records:

> CGBA . . . queried its electronic records keeping system for claims data for the providers specific in [the] Plaintiff's FOIA request using each entities' Provider Transaction Access Number ("PTAN")[,] which is a unique identifying number assigned to all Medicare providers. The date ranges used to search for the claims data were May 1, 2003 through December 31, 2003 and January 1, 2004 through December 31, 2007 . . . . CGBA also searched for data between January 1, 2008 through December 31, 2012, however, the PTAN's for the entities identified in [the] Plaintiff's FOIA request were terminated in 2007 and thus no records were located for the 2008-2012 timeframe.

*Id*. ¶ 9; *see* Def.'s SMF ¶ 37.

Blue Cross/Blue Shield of Georgia "maintained purged claim information" even after CGBA became the MAC. Def.'s SMF ¶ 36. CBGA gave Blue Cross/Blue Shield the PTAN, taxpayer identification number, and name of each health care facility. *Id*. ¶ 38. Blue Cross/Blue Shield located "507 pages of paid and denied claims in the search specific to the PTAN[] of each skilled convalescent facility." *Id*. Each PTAN expired in 2007, and for this reason, no records after 2007 were found. *Id*. ¶ 39.

### b. Division of Survey and Certification

As stated earlier, the three facilities operated by Forum Healthcare Group received Medicare funds. Regarding the Medicare program, the defendant's declarant explains:

9

> To determine whether a provider is meeting the Medicare conditions of participation, the HHS Secretary is required to enter into an agreement with a state, under which the services of appropriate state or local health agencies (or other appropriate state or local agencies) are used. To enter into such an agreement, the state must be able and willing to provide the contracted services and to determine whether a provider of services—a hospital, skilled nursing facility (SNF), home health agency (HHA), hospice, rural health clinic (RHC), critical access hospital (CAH), comprehensive outpatient rehabilitation facility, laboratory, clinic, rehabilitation agency, public health agency, or ambulatory surgical center (ASC)—meets the Medicare program [conditions of participation (CoPs)]. Before CMS will treat an institution or agency as a participating provider, the state agency conducts an investigation and determines that the provider or facility meets the CoPs; the state agency then certifies that fact to the HHS Secretary. State agencies also determine whether independent laboratories, RHCs, or suppliers of portable X-ray services meet the conditions for coverage (CfCs) of these services under Part B. State agencies advise providers and suppliers, as well as potential providers and suppliers, regarding applicable federal regulations to enable them to qualify for participation in federal health care programs and to maintain [the] standard of health care consistent with CoPs and CfCs.

Supp. Gilmore Decl. ¶ 26. The defendant's Division of Survey and Certification oversees this process. *Id*. The Georgia Department of Community Health, Division of Medical Assistance, is the state agency which CMS contracts with to perform the services described above. *Id*. ¶ 29.

Upon review of the Court's September 15, 2017 Memorandum Opinion and Order, and on further review of the plaintiff's letters dated May 10, 2015 and December 4, 2015, CMS realized that the plaintiff also sought "program regulatory and professional records generated by [HHS]," *id*. ¶ 22, and documents related to sanctions imposed on the three facilities, *id*.[7] Accordingly, CMS expanded its interpretation of the plaintiff's FOIA requests "to include

---

[7] *See* Compl., Ex. 2 (May 10, 2015 letter), Ex. A at 1, 3 (ECF No. 1 at 45, 47).

records regarding the civil monetary penalty ('CMP') letter from Sandra M. Pace, Associate Regional Administrator, Division of Survey and Certification, to Amy Kaminshine-Berne, Assistant [United States] Attorney[,]" *id*. ¶ 23, a copy of which the plaintiff attached to his December 4, 2015 letter.[8] It "tasked the Region 4 Division of Survey and Certification to conduct the search" because this "Division oversaw the surveys or visits to the facilities that lead to the imposition of the CMP." *Id*. ¶ 24.

Within the Division of Survey and Certification is the Long Term Care Certification and Enforcement Branch. *Id*. ¶ 27. Its Chief, "based on her knowledge of where records similar to those requested by [the] Plaintiff are typically stored," searched the Automated Survey Processing Environment Enforcement Management System ("AEMS"), "which monitors facilities certified to participate in the Medicare program[.]" *Id*. The defendant's declarant explained that monitoring providers "ensure[s] that they remedy deficient practices and establish procedures that sustain continued compliance." *Id*. "In severe instances of noncompliance, enforcement allows imposition of significant sanctions against the provider, including monetary penalties and program termination." *Id*.

The Chief of the Long Term Care Certification and Enforcement Branch also searched a file room where paper copies related to each survey are maintained, as well as her own files on CMP matters. Def.'s SMF ¶ 26. The AEMS search yielded one responsive document, which was a two-page draft of the CMP letter. *Id*. ¶ 27. And, located in a three-ring binder maintained by the Chief was a four-page settlement agreement between the three facilities and CMS dated

---

[8] *See* ECF No. 1 at 125-26.

July 21, 2008.  *Id*.; *see* Supp. Gilmore Decl. ¶ 32.  No other responsive records were located.  Def.'s SMF ¶ 27.

### c. Georgia Department of Community Health

Ordinarily, CMS retained "documents not subject to litigation" for seven years.  *Id*.  Not until December 2017 did "CMS realize[] that potentially responsive records might have been lost due to the scheduled destruction timeframes under the retention policy[.]"  *Id*. ¶ 28.  Because CMS misunderstood "the breadth of [the] plaintiff['s] request until December 2017, CMS did not retain any other records that may have been responsive" to the FOIA request.  *Id*.  ¶ 27.  In an effort to replace records which may have been destroyed, CMS contacted the Georgia Department of Community Health, Division of Medical Assistance, and asked that it search for any federal records it had about the three facilities.  *Id*.

Deloris Cooper, Open Records Clerk with the Georgia Department of Community Health, Health Facilities Regulation Division, *see* Affidavit of Deloris Cooper (ECF No. 56-5, "Cooper Aff.") ¶ II, "conducted a search for state agency records, correspondence or other information regarding a [CMP] imposed on the Forum Group at Mount Berry Nursing & Rehabilitation Center, LLC [and] two . . . related facilities, the Forum at Moran Lake and the Forum at Wildwood[,]" *id*. ¶ IV.  Her search yielded no physical files, and the electronic records she found "were scanned and uploaded to the CMS FOIA sFTP folder on December 20, 2017."  *Id*.  The Georgia Department of Community Health "provided [to CMS] three files totaling 654 pages consisting of survey records related to each nursing and rehabilitation center identified in the request[.]"  Def.'s SMF ¶ 28 (footnote omitted).  It later produced to CMS another 921 pages of records.  *Id*. ¶ 32.

### 5. Releases of Responsive Records

CMS released in full 55 pages of records, identified as "'Notices of Medicare Program Reimbursement,' settlement notices, and reviews of Medicare cost reports," to the plaintiff on March 2, 2016.  First Gilmore Decl. ¶ 11; *see id.* ¶ 10; Def.'s SMF ¶ 30.  From "several Excel spreadsheets documenting paid and denied Medicare claims" associated with the three Forum Group facilities and released to the plaintiff.  CMS redacted certain information under FOIA Exemption 6.  *See* First Gilmore Decl. ¶¶ 12-14.

On January 18, 2018, CMS released to the plaintiff the survey records obtained from the Georgia Department of Community Health (654 pages), the draft CMP letter (2 pages), and the settlement agreement (4 pages).  Def.'s SMF ¶ 31.  And on September 13, 2018, CMS released to the plaintiff the 921 additional pages of redacted records obtained from the Georgia Department of Community Health.  *Id.* ¶ 32.

## II. DISCUSSION

### A. Summary Judgment Standard

The Court may grant summary judgment to a government agency as the moving party if it shows that there is no genuine dispute as to any material fact and if it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The Court may grant summary judgment based on information in an agency's supporting declaration if the declaration is "relatively detailed and nonconclusory[.]"  *Goland v. CIA*, 607 F.2d 339, 352 (D.C. Cir. 1978) (footnote omitted) (internal quotation marks omitted).  Further, the supporting declaration must "describe the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and [is] not

13

controverted by either contrary evidence in the record [or] by evidence of agency bad faith." *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981) (footnote omitted).

### B. Adequacy of the Defendant's Searches

An agency "fulfills its obligations under FOIA if it can demonstrate beyond material doubt that its search was reasonably calculated to uncover all relevant documents." *Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641 F.3d 504, 514 (D.C. Cir. 2011) (citations and internal quotation marks omitted).  The agency may submit affidavits or declarations to explain the method and scope of its search, *see Perry v. Block*, 684 F.2d 124, 127 (D.C. Cir. 1982), and such affidavits or declarations are "accorded a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents," *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (citation and internal quotation marks omitted).

Because the plaintiff sought financial, claim reimbursement, and accounting information, and other materials pertaining to health care facilities in Georgia receiving Medicare funds, CMS, as noted earlier, referred his FOIA request to its Region 4, the region encompassing the state of Georgia.  And because its contractor, CGBA, would maintain records of this nature, CMS Region 4 referred the matter to CGBA.

The plaintiff sought records from 2003 to 2012, which included a time period preceding CGBA's contract with CMS.  For this reason, CGBA sought the assistance of its predecessor, Blue Cross/Blue Shield of Georgia.  CGBA searched hard and soft copy records it acquired from Blue Cross/Blue Shield when its contract began in 2009.  Using the PTAN for each facility, CGBA located three boxes containing potentially responsive records and found 55 pages of

records specific to the Moran Lake facility.  From purged claim records retained by Blue Cross/Blue Shield, using the PTAN, taxpayer identification number and the name of each facility as search terms, CGBA located information about paid and denied claims.  Because each PTAN expired in 2007, CGBA found no records for any years after 2007.

Notwithstanding CMS' overly-narrow initial interpretation of the plaintiff's FOIA request, the defendant shows that CMS changed course and expanded its search to include program and regulatory records, such as the CMP letter regarding the Mount Berry facility.  *See* Supp. Gilmore Decl. ¶¶ 23-24.  It sought assistance from the Chief of the Division of Survey and Certification, who searched three sources where responsive records likely would be found: the Automated Survey Processing Environment Enforcement Management System, which monitors facilities participating in the Medicare program, a file room containing paper files, and her own files because her responsibilities involved CMP matters.  *See id.* ¶¶ 25, 27.  Her search discovered a two-page draft of a CMP letter in AEMS and a four-page settlement agreement.  *See id.* ¶ 28.

CMS did not place a "litigation hold" on potentially responsive records after it received the plaintiff's FOIA request.  As a result, certain survey-related records were destroyed, and could not be provided to the plaintiff.  The plaintiff has made no showing that CMS purposely destroyed documents in order to avoid having to release them, and nothing in the record of this case suggests that CMS's error was willful or otherwise warrants further action by the Court.  *Cf. Cal–Almond, Inc. v. U.S. Dep't of Agric.*, 960 F.2d 105, 109 (9th Cir.1992) ("Absent a showing that the government has improperly destroyed agency records, FOIA does not require these records to be recreated.") (internal quotations omitted).  Furthermore, "[i]f the agency is no

longer in possession of the document, *for a reason that is not itself suspect*, then the agency is not improperly withholding that document and the court will not order the agency to take further action in order to produce it." *SafeCard Servs.*, 926 F.2d at 1201 (emphasis added). If anything, CMS sought to minimize the effects of not having implemented a litigation hold by contacting the Georgia Department of Community Health, Division of Medical Assistance, to possibly obtain copies of these records as substitutes for the records it had destroyed.

An agency's search need not be exhaustive, *see Miller v. U.S. Dep't of State*, 779 F.2d 1378, 1383 (8th Cir. 1995), and it need not be perfect, *see DiBacco v. U.S. Army*, 795 F.3d 178, 191 (D.C. Cir. 2015) ("[A]dequacy – not perfection – is the standard that FOIA sets."). Here, based on the record outlined above, the Court concludes that the defendant has demonstrated that its searches for responsive records were reasonable under the circumstances of this case.

### C. FOIA Exemption 6

Information contained in responsive records has been withheld by the defendant from disclosure to the plaintiff under FOIA Exemption 6. Exemption 6 protects "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). The Court's first task in assessing whether non-disclosure is warranted is to determine whether the responsive records are personal, medical or similar files. *Multi Ag Media LLC v. Dep't of Agric.*, 515 F.3d 1224, 1228 (D.C. Cir. 2008). Next, the Court must determine whether disclosure of the third-party information "would constitute a clearly unwarranted invasion of personal privacy." *Id.* (quoting 5 U.S.C. § 552(b)(6)). "This second inquiry requires [the Court] to balance the privacy interest that would be compromised by disclosure against any public interest in the requested information." *Id.*

(citations omitted).  Here, the only relevant public interest the Court must consider is the underlying purpose for the enactment of the FOIA: to "shed[] light on an agency's performance of its statutory duties[.]"  *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 762 (1989).  The Court will evaluate the propriety of the non-disclosures from that perspective.

### 1. Beneficiary Identification Numbers

Among the records obtained from BlueCross/Blue Shield of Georgia were 507 pages of records of paid and denied claims, *see* Def.'s SMF ¶ 38, in the form of Excel spreadsheets, *see* First Gilmore Decl. ¶ 12.  From the spreadsheets CMS withheld each beneficiary's identification number ("HIC_NR"), *see id.*, which at that time included the beneficiary's Social Security number, *see* Supp. Gilmore Decl. ¶ 45.  Its declarant offered the following rationale:

> I determined that release of the information in [the HIC-NR] column would result in a clearly unwarranted invasion of personal privacy, after balancing the privacy interests of the beneficiaries against the public benefit in disclosure.  I determined that the beneficiaries maintain a strong privacy interest in their personal information captured in the Medicare claims records, including confidential information regarding their medical care.  I found this substantial privacy interest to greatly outweigh the public interest in disclosure, if any.

First Gilmore Decl. ¶ 15.

### 2. Identifying Information in Survey Records[9]

CMS also withheld the following information under FOIA Exemption 6: the position title of persons interviewed by the surveyors, residents' names, and Social Security numbers, resident

---

[9] CMS is relying on FOIA Exemption 6 in conjunction with FOIA Exemption 7(C) to withhold certain information from the survey records.  *See* Def.'s SMF ¶ 42.  The declarant does not identify a law enforcement purpose for which the survey records might have been compiled, and therefore has failed to demonstrate that FOIA Exemption 7(C) applies.

17

room numbers, the identities of state survey agency employees, and personally identifiable information of patients. Def.'s SMF ¶ 42. Its declarant explains the rationale for these non-disclosures as follows:

> CMS determined the release of this material in the survey records would result in a clearly unwarranted invasion of personal privacy, after balancing the privacy interests of the interviewees and patients against the public benefit in disclosure. Persons interviewed in connection with a survey of a nursing facility maintain a strong privacy interest in their position titles because with the position title, date, and facility name, the identity of the individual would be easily determined in connection with a particular survey. Additionally, the patients maintain a strong privacy interest in their names, social security numbers, identifying characteristics, and medical information. Although the patient names are not provided in the surveys, with the additional information of date, facility, location, and other contextual clues in the records, the patients could be identified . . . . Finally, an employee with the state survey agency maintains a strong privacy interest in his or her identity because it is associated with the surveys into Plaintiff's facilities.

Supp. Gilmore Decl. ¶ 45.

Protection under Exemption 6 is not limited to "a narrow case of files," but instead "cover[s] detailed Government records on an individual which can be identified as applying to that individual." *U.S. Dep't of State v. Wash. Post Co.*, 456 U.S. 595, 602 (1982). In other words, Exemption 6 is designed "to protect individuals from the injury and embarrassment that can result from the unnecessary disclosure of personal information" maintained in government records, *id*. at 599, regardless of "the label on the file," *id*. at 601 (citation omitted). The Court is satisfied that documents like the ones identified above qualify as "medical or similar files" for purposes of Exemption 6.

CMS maintains, and the Court concurs, that there is no public interest in disclosure of the redacted information, as disclosure of position titles, room numbers, residents' identifying

characteristics, residents' medical information, beneficiaries' Social Security numbers, and the state survey agency employees' identities "would shed no additional light on the government's operations and activities that release of the overall survey investigation records does not provide." Supp. Gilmore Decl. ¶ 45; *see* First Gilmore Decl. ¶ 15. Non-disclosure of the information was therefore appropriate.

### D. Segregability

If a record contains some information that is exempt from disclosure, any reasonably segregable information not exempt from disclosure must be released after deleting the exempt portions, unless the non-exempt portions are inextricably intertwined with exempt portions. 5 U.S.C. § 552(b); *see Trans-Pacific Policing Agreement v. U.S. Customs Serv.*, 177 F.3d 1022, 1027 (D.C. Cir. 1999). The Court errs if it "simply approve[s] the withholding of an entire document without entering a finding on segregability, or the lack thereof." *Powell v. U.S. Bureau of Prisons*, 927 F.2d 1239, 1242 n.4 (D.C. Cir. 1991) (quoting *Church of Scientology of Cal. v. U.S. Dep't of the Army*, 611 F.2d 738, 744 (9th Cir. 1979)).

Here, the defendant's declarant represents that "a line by line review of all of the records involved [was conducted] and [that the defendant] released all reasonably segregable information." Supp. Gilmore Decl. ¶ 46. Upon reviewing the defendant's supporting declarations, the Court agrees that the agency has released all non-exempt portions of the responsive records.

## III. CONCLUSION

The Court concludes that the defendant has demonstrated its compliance with the FOIA. It conducted adequate searches for records responsive to the plaintiff's FOIA request and has

justified its decision to withhold all of the information not disclosed to the plaintiff under FOIA Exemption 6.  Accordingly, the Court will grant the defendant's motion for summary judgment.  Additionally, the Court will deny the plaintiff's motions for extensions of time to respond to the defendant's motion for summary judgment.  An order is issued separately.

DATE: September 14, 2020             /s/
                                     REGGIE B. WALTON
                                     United States District Judge